IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| SMARTSKY NETWORKS, LLC, a Delaware limited liability company | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. |
| WIRELESS SYSTEMS SOLUTIONS, LLC, a Delaware limited liability company; DAG WIRELESS LTD, an Israeli company; DAG WIRELESS USA, LLC, a North Carolina limited liability company; LASLO GROSS, a North Carolina resident; SUSAN GROSS, a North Carolina resident; DAVID D. GROSS, a resident of Israel, | ) ) ) ) ) ) ) ) ) ) ) | <u>1:20-cv-00834</u>  **JURY TRIAL REQUESTED** |
| Defendants. | ) ) | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiff SmartSky Networks, LLC ("SmartSky" or "SSN") files this action against

Defendants Wireless Systems Solutions, LLC ("WSS"), DAG Wireless, Ltd. ("DAG

Israel"), DAG Wireless USA, LLC ("DAG USA") (DAG Israel and DAG USA,

collectively, "DAG"), Laslo Gross, Susan Gross, and David D. Gross (collectively, the

"Gross Defendants"), (collectively, the "Defendants") seeking injunctive relief and

damages for misappropriation of trade secrets, breaches of contracts, and violation of the

North Carolina Unfair and Deceptive Trade Practices Act.

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………….…..¶¶ 1-8

PARTIES        …………………………………….……………...¶¶ 9-15

JURISDICTION AND VENUE …………...…………………………..…¶¶ 16-19

FACTUAL BACKGROUND …………………………………………...¶¶ 23-166

    I.      SmartSky's Airborne Wireless Business. …………….…………¶¶ 23-29

    II.     The Gross Family Businesses: WSS and DAG ………..……....¶¶ 30-51

    III.    SmartSky Engages WSS to Develop SmartSky ATG Products.…...¶¶ 52-86

        A.     Statements of Work and the █████████████

        B.     Purchase Orders

    IV.    SmartSky Provides WSS With Materials and Equipment to Build the Products.   …………………………………………….....….¶¶ 87-94

    V.     SmartSky Authorizes WSS to Use SmartSky Intellectual Property to Develop and Build the Products .…………………………....¶¶ 95-101

    VI.    The Agreements Protect SmartSky's Intellectual Property..……¶¶ 102-124

    VII.   WSS Accepts Tens of Millions of Dollars from SmartSky But Refuses to Perform Under the Agreements…….……………………¶¶ 125-136

    VIII.  WSS Claims Ownership of the Products and SmartSky Equipment and Threatens to Sell the Products to Third Parties in Violation of the ██████ ████████ …………………………….…………....¶¶ 137-150

    IX.    WSS Uses its Alter Ego DAG to Produce and Sell the Products..¶¶ 151-162

2

     X.      SmartSky Terminates the Agreements and Demands that WSS and DAG

              Cease and Desist from Misappropriating SmartSky IP and Developed IP

              and from Selling the Product or Derivatives Thereof in the SmartSky Field

              of Use...……………………………………………...….¶¶ 163-166

CAUSES OF ACTION 1-14 …………………………………………...¶¶ 167-275

PRAYER FOR RELIEF

DEMAND FOR JURY TRIAL

EXHIBITS

     1.      █████████████

     2.      PO002129

     3.      April 4, 2019 Terms & Conditions

     4.      Reciprocal Confidentiality and Non-Disclosure Agreements dated
              December 1, 2017

     5.      Amended Reciprocal Confidentiality and Non-Disclosure Agreements
              dated January 27, 2018

     6.      Mutual Non-Disclosure Agreement dated January 27, 2018

     7.      Multi-Party Non-Disclosure Agreement dated February 22, 2018

     8.      WSS Roster

     9.      Recommendation Letter for Ofek Toledano

     10.    Email dated December 13, 2018

11. Reciprocal Confidentiality and Non-Disclosure Agreement" dated January 15, 2019

12. https://www.computerweekly.com/news/252487478/DAG-Wireless-unveils-4G-5G-infrastructure-for-in-flight-connectivity (last visited Sept. 8, 2020)

13. Termination Letter dated September 4, 2020

# INTRODUCTION

1. Since 2018, SmartSky has paid WSS over $30 million to develop, build, test, and produce components to complete SmartSky's proprietary, end-to-end, air-to-ground ("ATG") wireless communication network for in-flight travelers, airlines, flight crews, and other data users. WSS took the money, but has failed to perform. WSS members Laslo Gross and Susan Gross, and WSS executive David Gross, instead funneled SmartSky intellectual property, equipment, and materials to a family-owned alter ego, DAG, to build a competing product that they intend to market and sell as their own. As of the date of this filing, *DAG* has publicly claimed that it developed the very ATG network components that SmartSky paid *WSS* tens of millions of dollars to develop and build, and is actively marketing and offering to sell products based on this claim. In a futile attempt to avoid plain and obvious legal liability, DAG claims that it developed its technology independent of and with no reliance on the millions of dollars of SmartSky intellectual property, equipment, and materials that DAG obtained directly from WSS. DAG's claim is disingenuous, implausible, and false. In the final analysis, the business relationship between SmartSky and WSS resulted in: (1) WSS receiving over $30 million and access to SmartSky intellectual property, (2) DAG using those resources to build itself products while WSS strung SmartSky along with frequent delays, and (3) SmartSky left holding the bag.



5



3.     WSS failed to perform under the Agreements, setting SmartSky's proposed launch date back months if not years. Either because WSS recognized it could not fulfill its contractual obligations, or because it wanted to own and profit from the products it was building for SmartSky, WSS began making unreasonable, extra-contractual demands to excuse and divert attention from its failure to perform and hide its ulterior motives.





7.     Absent interim relief from the Court—and ultimately permanent injunctive relief—SmartSky's business will be irreparably harmed, and Defendants will have succeeded in going to market with the very technology that SmartSky paid WSS to develop.



## **PARTIES**

9.     Plaintiff SmartSky is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 430 Davis Drive, Suite 350, Morrisville, NC 27560.

10.     Defendant WSS is a North Carolina limited liability company, organized and existing under the laws of the State of North Carolina with its principal place of business at 102 Ripplewater Lane, Cary, North Carolina, 27518. WSS maintains an office at 630 Davis Drive, Morrisville, North Carolina 27560. (https://www.wireless2.com/contact-1 (last visited on Sept. 8, 2020).)

11.     Defendant DAG Israel is an Israeli limited partnership, organized and existing under the laws of Israel with its principal place of business at Nahalat Yitzchak

8

32, 3rd Floor Tel Aviv, Israel 67448. DAG Israel is the managing member of DAG USA, according to DAG USA annual reports filed with the North Carolina Secretary of State.

12.     Defendant DAG USA is a North Carolina limited liability company, organized and existing under the laws of the State of North Carolina with its principal place of business at 630 Davis Drive, Suite 250, Morrisville, North Carolina, 27560, where WSS also does business. DAG may be served by its registered agent, David Gross, at WSS's principal place of business, which is also the registered agent address for DAG USA, 102 Ripplewater Lane, Cary, North Carolina, 27518.

13.     Defendant Laslo Gross is an individual residing in North Carolina and may be served at 102 Ripplewater Lane, Cary, North Carolina, 27518. Laslo Gross is Susan Gross's spouse and David Gross's father.

14.     Defendant Susan Gross is an individual residing in North Carolina and may be served with process at 102 Ripplewater Lane, Cary, North Carolina, 27518. Susan Gross is Laslo Gross's spouse and David Gross's mother.

15.     Defendant David Gross is an individual residing, upon information and belief, in Israel. David Gross is the son of Laslo Gross and Susan Gross.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because SmartSky pleads a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA")

17.     This Court has supplemental jurisdiction over the remaining claims in this lawsuit because they form part of the same case or controversy as the federal question raised under the DTSA. 28 U.S.C. § 1367.



19.     DAG is bound by the foregoing jurisdiction and venue provisions because it is an alter ego of WSS, has benefited from the Agreements, and its conduct is closely related to the contractual relationship between WSS and SmartSky.

20.     The Gross Defendants are bound by the foregoing jurisdiction and venue provisions because they have benefited personally from the Agreements, and are closely related to the contractual relationship between WSS and SmartSky.

10

21.     The Court has general, or at least specific, personal jurisdiction over DAG Israel because, without limitation, DAG Israel has a North Carolina affiliate (DAG USA) for which DAG Israel purports to be the managing member; has made contracts with and provided services for North Carolina companies (WSS and SmartSky); its members and employees travel to North Carolina for work-related purposes; and it has committed and directed tortious acts towards SmartSky in North Carolina.

22.     The Court has general, or at least specific, personal jurisdiction over David Gross because, without limitation, he is the registered agent for a North Carolina company (DAG USA); works for and executed contracts on behalf of a North Carolina company (WSS); frequently communicates with and provides services for North Carolina companies (WSS and SmartSky); travels to North Carolina for work-related purposes; owns property in North Carolina; and has committed and directed tortious acts towards SmartSky in North Carolina.

## FACTUAL BACKGROUND

### I.     SmartSky's Airborne Wireless Business

23.     Founded in 2011, SmartSky is an industry leader in developing and deploying the next generation of ATG communication networks for air travelers, designed to deliver best-in-class speed, capacity, and latency to provide users seamless data transmission and connectivity during air travel.

24.     SmartSky is an innovator, revolutionizing ATG connectivity with over 185 granted patents globally, more than eighty of which are issued in the US alone, and more

11

than 129 patents pending globally. SmartSky's patented, trade secret, proprietary, and confidential technology represents an investment of tens of millions of dollars in research and development over nearly a decade. It is because of these innovations that SmartSky boasts the only ATG network design capable of offering services with real-time bidirectional high-speed connectivity without the high latency of satellite-based solutions or the speed limitations of dated cellular technology.

25.     SmartSky goes to great lengths to protect its intellectual property, including by seeking patent protection for its novel inventions, and preventing public disclosure of its proprietary, confidential, and trade secret information, including by requiring that contractors and employees enter non-disclosure agreements.

26.     SmartSky contracts with third parties to build components necessary for the rollout of its unique, patented, and trade secret ATG network technologies. Through these agreements, SmartSky authorizes use of its intellectual property—subject to non-disclosure and confidentiality restrictions—and provides equipment, materials, and tools to facilitate performance by these third parties.

27.     SmartSky sells its completed products and technologies to value added resellers ("VAR"), original equipment manufacturers ("OEM"), and maintenance, repair and overhaul ("MRO") companies (collectively, the "Customers"). The Customers then sell the SmartSky products to airlines, fleets, private jet owners, and operators for installation in aircraft. Once the ATG network is commercially launched, SmartSky plans to provide monthly service to the Customers or the end users to ensure a seamless high-

12

speed, low-latency broadband connection from aircraft to the internet that is on par with a home or office Wi-Fi network.

28.     Because the ATG communications industry is highly competitive, SmartSky is required to release new products and technologies to its Customers in a timely manner. Failure to do so will harm SmartSky's reputation and cause Customers to fulfill needs through SmartSky's competitors. Once a competitor has claimed "real estate" on an aircraft by installing its hardware, it is extremely difficult to get that system removed and replaced due to the substantial investment and permanent aircraft modifications required for a Federal Aviation Administration ("FAA")-certified equipment installation.

29.     For these reasons, it is crucial that parties contracting with SmartSky timely complete and deliver pursuant to their contractual obligations.

## II.     The Gross Family Businesses: WSS and DAG

30.     WSS claims to be in the business of developing, manufacturing, and selling wireless technology and products, including software for use in computer and communications networks and protocols for the exchange of information. Before entering the Agreements, WSS had no specific expertise in aviation technology, including ATG communication technology.

31.     WSS is run by husband and wife Laslo Gross and Susan Gross.

32.     The Grosses have employed their son, David Gross, as an executive at WSS since 2010. Through at least August 18, 2020, David Gross represented through his LinkedIn profile that he was currently employed by WSS as Director of Operations.

13

Between then and the date of this filing, David Gross changed his LinkedIn profile to state that his employment with WSS ended in January 2018.

33. Each of the Gross Defendants has access to SmartSky IP—which consists of, without limitation, trade secrets and patented information—under the business relationship between SmartSky and WSS. Indeed, David Gross is WSS's designated "coordinator" for receiving confidential information from SmartSky pursuant to a Reciprocal Confidentiality and Non-Disclosure Agreements ("WSS NDA"), dated December 1, 2017 and amended on January 27, 2018. True and correct copies of the WSS NDAs are attached hereto as "Exhibit 4" and "Exhibit 5."

34. David Gross executed the December 1, 2017 WSS NDA on behalf of WSS. The agreement specifically required David Gross and WSS to "keep such information confidential and not to disclose the same to third parties or to act upon said Proprietary or Confidential Information . . . ." Each of the Gross Defendants is under obligation to not disclose or misuse SmartSky IP.

35. On January 27, 2018, David Gross signed a "Mutual Non-Disclosure Agreement" on behalf of WSS. A true and correct copy of the Mutual Non-Disclosure Agreement is attached hereto as "Exhibit 6."

36. In February 2018—the same month that WSS was entering its second and third POs with SmartSky, and literally days after David Gross was listed as WSS's "coordinator" on the amended WSS NDA—the Gross Defendants formed DAG Israel. Laslo and Susan Gross installed their son David Gross as DAG Israel's ostensible head.

14

37. But David Gross never stopped working for WSS. Simultaneous to his role with DAG, David Gross remained employed by WSS as Director of Product Management or Operations. In this capacity—despite now claiming on his LinkedIn profile that he ended employment with WSS in January 2018—David Gross signed, without limitation, the following SmartSky SOW's on WSS's behalf:

      a.    SOW 2 – Feb. 9, 2018

      b.    █████ – Feb. 16, 2018, Dec. 13, 2018

      c.    SOW 4 – Feb. 9, 2018

38. On February 22, 2018, David Gross executed a "Multi-Party Non-Disclosure Agreement" on WSS's behalf, which listed him as WSS's "primary representative . . . responsible for coordinating disclosure or receipt of Confidential Information." A true and correct copy of the Multi-Party Non-Disclosure Agreement is attached hereto as "Exhibit 7."

39. David Gross still conducts all business communication with SmartSky from a WSS email address (david@wirelesss2.net).

40. David Gross is not unique among DAG employees. DAG held out its entire development team as working for WSS: they communicate from "@wirelesss2.net" domains, are included on a list of "WSS Personnel" that was circulated to SmartSky employees, and did not disclose that they were not in fact employed by WSS during frequent and numerous interactions with SmartSky. A true and correct copy of the WSS roster—provided by WSS to SmartSky—is attached hereto as "Exhibit 8"

15

41.    Boaz Reuven, Erez Loebl, Golan Adari, and Ofek Toledano are engineers who work primarily in Israel and have been held out to SmartSky as WSS employees. But they are employees of DAG. On December 18, 2019, David Gross requested that SmartSky's Mike Dodson write recommendation letters for Loebl, Adari, Toldano, and Bakhrayba to attend an electrical engineering program in the United States. In the example recommendation letter that David Gross had prepared for Toledano (which presumably took the same form as his letters for the other three individuals), David Gross wrote on DAG letterhead and described Toledano as having "worked at our company, DAG Wireless Ltd. in Israel." No mention is made of WSS. A true and correct copy of this letter is attached hereto as "Exhibit 9." Upon information and belief, David Gross described the employment of Loebl, Adari, and Bakhrayba in the same manner in separate letters.



43.    When SmartSky personnel visited Tel Aviv in December 2018 to view WSS's progress, they were greeted with an email stating: "**Welcome to WSS DAG Israel**." A true and correct copy of this email is attached hereto as "Exhibit 10."

16

44.     Upon SmartSky learning of DAG Israel's existence, SmartSky, WSS, DAG, and Hermon Labs Ltd. entered a "Reciprocal Confidentiality and Non-Disclosure Agreement" dated January 15, 2019 (the "Joint NDA"). David Gross—while still employed by WSS—signed on behalf of DAG Israel. Boaz Reuven was listed as DAG Israel's "coordinator for disclosing or receiving information." A true and correct copy of the Joint NDA is attached hereto as "Exhibit 11."

45.     Upon information and belief, Laslo Gross and Susan Gross control or have substantial say over DAG's business objectives, business strategy, finances, hiring decisions, termination decisions, marketing, advertising, and workflow.

46.     The WSS and DAG websites share similar layouts and some identical content. In at least one place—DAG's description of "Telecoms and Mobile"—DAG specifically references "WSS" instead of DAG. https://www.dagwireless.com/markets (last visited Sept. 8, 2020).

47.     Both websites have "Markets" tabs describing the various industries in which the companies offer their respective services. Both companies currently list "Aviation" as a "Market," and provide *identical* written descriptions of that work. (Compare https://www.dagwireless.com/markets and https://www.wireless2.com/aviation (last visited Sept. 8, 2020).)

48.     In June 2019, DAG USA was formed in North Carolina, with DAG Israel named as its managing member and organizer and David Gross named as its registered

17

agent with a registered agent address at the same address as WSS's principal place of business, 102 Ripplewater Lane, Cary, North Carolina, 27518.

49.     Property records from Wake County, North Carolina show that David Gross is one of two owners (the other being his brother, Michael Avi Gross) of the 102 Ripplewater Lane property. Laslo Gross and Susan Gross are residents of the 102 Ripplewater Lane property.

50.     In its 2020 Annual Report to the state of North Carolina, submitted April 16, 2020, DAG USA listed DAG Israel as its managing member, with David Gross as its registered agent.

51.     DAG is an alter ego or mere business conduit for WSS, Laslo Gross, Susan Gross, and David Gross.

## III.    SmartSky Engages WSS to Develop SmartSky ATG Products.

52.     By December 2017, SmartSky had contracted with numerous VARs, MROs, and OEMs to supply ATG network products, including software technology, and had received interest from several more. To satisfy these existing agreements and win additional business, it was crucial for SmartSky to bring its technology to market timely. SmartSky's primary competitors were working on or had existing products, but SmartSky's system would be faster and less expensive.



18



## A.     The Products

55.     WSS's primary proposed deliverables to SmartSky included advanced remote radio heads ("ARRH"), Base Band Units ("BBU"), Airborne Radio ("ABR"), Test UEs, and SmartCarts (collectively, the "Products") to be developed in accordance with SmartSky specifications and requirements.

56.     The ARRH is a remote software defined radio (SDR) fixed to a communications tower as part of the terrestrial base station. The ARRH and antenna (WSS did not develop or manufacture the antenna, which was already tested and in use in the demonstrated ▇▇▇ system) establish a wireless communications link with the ABR (*see infra* ¶ 57) send and receive data between the terrestrial network and the aircraft. The ARRH is one component necessary for SmartSky's robust ATG communications network and uses SmartSky's proprietary beamforming technology to generate steerable beams that

allow the same frequency to be reused to communicate with in-flight ABRs by air-link. The ARRH sends high-speed data communications links that can be maintained continuously and uninterrupted in time while the ABRs move between steerable beams from different base stations. The ARRH employs Orthogonal Frequency Division Multiplexing ("OFDM") and frequencies in the 2.4 GHz band.

57.     The BBU:

a.      is located at the base of the terrestrial base station;

b.      provides the communications logic to enable communications with the ABR via the ARRH;

c.      allows seamless transition from one ARRH to another located on the same tower;

d.      facilitates uninterrupted user experience by interfacing with other terrestrial network elements that enable the ABR to communicate to and from the internet as well as communicate with the centralized terrestrial network functions that enable ABRs to move seamlessly between terrestrial base-stations;

e.      employs LTE protocols modified to SmartSky's specification, thereby ensuring communications can be established with a fast moving very distant ABR;

f.      is a part of a land based, nationwide network of base stations, fully meshed broad-band communications transport and data centers which when combined with the ARRH, ABR, and the other pre-existing components (including ground and aircraft

20

antennas and the wireless access point in the aircraft) to form a robust ATG communications network.

58. The ABR is installed in an aircraft and functions much like a modem. It communicates to the terrestrial network by connecting wirelessly to the ARRH, which is then hardwired to the BBU. Data sent and received by the ABR from the terrestrial network is forwarded to a WiFi access point that is located on the aircraft and connected to the ABR. The end-user can then access SmartSky's ATG by connecting to the WiFi access point with their personal communications device (computer/tablet/mobile phone) just like at home or the office. This high-speed wireless connection allows multiple end users (passengers and crew on the aircraft) to send and receive data, voice, or video. To assure the end user's connection to the terrestrial network is robust and seamless, the ABR:

a. communicates with multiple ground stations that receive high-speed wirelessly transmitted data (which the end user would receive on his computer/tablet /mobile phone on the aircraft as data, voice or video);

b. communicates with multiple ground stations that have overlapping coverage areas, and to provide a high-speed data communications link continuous and uninterrupted in time while an aircraft moves between coverage areas;

c. accounts for Doppler shift due to aircraft speeds greater than 100 mph;

d. employs frequencies in the range between 2 and 6 GHz using OFDM;

e. employs LTE protocols;

f. and combines with other components to form a robust ATG network.

21

59.     The Test UE and SmartCart are crucial test devices used for maintaining a functioning ATG wireless network.

60.     Test UE units are designed to verify the operation of the ground station (ARRH/BBUs) at the time of installation, where testing is performed below four hundred feet in ground elevation and within a few hundred feet from the site. Test UE can also measure performance of the system software in the field because they operate on the same signals used by the ABRs.

61.     A SmartCart unit is a mobile test "cart" that emulates the SmartSky ground network to  allow installation personnel to ensure proper installation and operation of the SmartSky system prior to the aircraft taking flight.

62.     The Products must work in tandem to establish a robust ATG network to enhance air traveler connectivity.

**B.      Statements of Work and the** ██████████████

63.     On December 22, 2017, SmartSky and WSS entered into SOW 1, "Modelling – Noise Cancellation, Doppler, Range and Altitude," and PO001658. SmartSky paid WSS $850,000 in full satisfaction of the PO.

████████████████████████████████████████████████████████

65.     On February 9, 2018, SmartSky and WSS entered into SOW 2, "Task Areas 1 & 2," and PO001767. SmartSky paid $1,100,000 toward SOW 2 but WSS failed to deliver on its development promises.

22



23



72.     DAG claimed in a press release that it obtained FCC certification for an ABR product on or around August 11, 2020, but SmartSky has been unable to corroborate this claim.

24

**C.     Purchase Orders**

76.     In addition to the services contracted for under the SOWs, SmartSky entered stand-alone POs for development and production of ATG hardware necessary to develop its end-to-end network.

---

[1] Section 1.11 of the ███████████ defines "Specification" as "the specifications for the Product as described within the attached applicable SOW."

25

77.     On or around June 13, 2018, SmartSky and WSS entered PO2129 for the production of 516 BBUs and 1,548 ARRH units. In exchange, SmartSky would pay WSS $15,480,000.00. (*See* Ex. 2.) PO2129 was governed by the April T&C, in which the parties agreed that "[d]elivery time is of the essence." (Ex. 3, April T&C, § 3.)

78.     WSS has delivered less than half of the ARRH units—708 of 1,548—despite being paid more than the value of the PO—$8,331,947.64 of $8,255,994.84.

79.     SmartSky returned 119 ARRH units for phase updates. WSS agreed to update these units "at no charge to SSN," pursuant to WSS Invoice #191881 dated December 19, 2019, but has now refused to return the units and demands additional payments for them.

80.     WSS has claimed that additional units were available for pickup, but conditioned pickup on entering into a new license agreement, even though those terms were already dictated by the existing April T&C. In an email dated June 22, 2020, a WSS employee indicated the ARRH units were still being produced, which was at odds with the claim they were finished and ready for pickup.

81.     On or around September 6, 2018, SmartSky and WSS entered into PO002410 ("PO2410") for production of 100 SmartCarts. On September 19, 2019, SmartSky made a $500,000 prepayment due under the PO. The parties cancelled PO2410 and replaced it with

PO004424 ("PO4424"), dated March 20, 2020. The $500,000 prepayment applies to the prepayment under PO004424. WSS failed to deliver any SmartCarts.

82.     On August 17, 2020, WSS offered 459 ARRH units for pick-up, but refused testing to which SmartSky was entitled by contract.



85.     WSS has delivered the 516 BBUs, and SmartSky paid in full—$7,224,000.

86.     On or around October 23, 2018, SmartSky and WSS entered into PO002550 ("PO2550") for production of 50 Test UEs. SmartSky paid a $166,667 prepayment due under the PO. WSS failed to deliver any Test UEs.

**IV.     SmartSky Provides WSS With Materials and Equipment to Develop and Build the Products.**



27



89.     WSS used, or is using, the SmartSky Materials to manufacture the ARRH units and ABRs.

90.     WSS also lacked much of the specialized equipment and tools necessary to develop, test, and troubleshoot the Products.

92.     WSS shipped some SmartSky Equipment to DAG Israel.

## V. SmartSky Authorizes WSS to Use SmartSky Intellectual Property to Develop and Build the Products.

95. SmartSky has expended significant time, effort, and expense to develop valuable, confidential, and proprietary technical information relating to the ATG network that it contracted with WSS to build.



Case 1:20-cv-00834-TDS-LPA   Document 1   Filed 09/10/20   Page 29 of 76



Case 1:20-cv-00834-TDS-LPA   Document 1   Filed 09/10/20   Page 30 of 76

97.     SmartSky has taken reasonable steps to keep the confidential and proprietary information alleged in the immediately preceding paragraph secret and to prevent public disclosures. These steps include, without limitation:

a.      requiring vendors, third-party contractors, and subcontractors like WSS and DAG to sign non-disclosure agreements;

b.      requiring SmartSky employees to sign non-disclosure agreements;

c.      making non-disclosure of confidential and proprietary information explicit in SmartSky's employee handbook;

d.      restricting SmartSky's employees' physical and electronic access to confidential and proprietary information and to reports containing such information;

e.      requiring a valid user login to access electronic information; and

f.      requiring two-factor login for SmartSky employees.

98.     As a result of the considerable investment in the research, development, marketing, and sale of its ATG network and component parts, and its efforts to keep confidential and proprietary information from public disclosure or use, SmartSky's

31

confidential and proprietary technology is commercially valuable, and will provide a distinct economic advantage to the first company to take it to market.

99.    SmartSky's ATG network promises and has demonstrated increased speed and capacity with decreased latency, which will immediately make it an industry standard ATG network for in-flight use.



## VI.    The Agreements Protect SmartSky's Intellectual Property.

102.    The April T&C protects SmartSky's ownership of its intellectual property, including "Deliverables" of goods and services supplied under the purchase orders, providing:

> Except for [WSS] IP which is incorporated in the Deliverables, originated with [WSS], and which may be completely severed from such Deliverables,

32

[WSS] shall not, either during the performance of this Purchase Order or thereafter, (i) reproduce or manufacture any Deliverables or any part thereof for any third parties utilizing any designs, drawings or other technical data or proprietary information or intellectual property belonging to or supplied by or on behalf of SSN except in the performance of Purchase Orders for SSN, or (ii) disclose any designs, drawings or other technical data or proprietary information or intellectual property which may be considered to be SSN IP, without first obtaining SSN's written consent.

(April T&C, § 15(b).)





34



35

opportunities, personnel, research and development activities, know-how and pre-release products . . . .

112.    The Joint NDA, signed by SmartSky, WSS, and DAG, protects SmartSky's ownership of its intellectual property, providing that "[e]ach party agrees that all information obtained from the other party in the past and/or going forward will be treated as strictly confidential and will not be disclosed to any third party . . . ." (Ex. 11, § 1.) Moreover, all "Proprietary and Confidential Information shall be used only for the Purpose set forth above and for no other purposes." (*Id.* § 2.)

113.    The purpose of the Joint NDA is

The Parties have agreed to share with each other information which is Proprietary and Confidential in connection with testing and certification, including but not limited to the Blackbird Remote Radio Head (RRH) + Airborne Station (ABR) ("Proprietary Information" or "Confidential Information").

(Joint NDA, introductory paragraph.)



36



118.   SmartSky and WSS reviewed relevant SmartSky IP in detail for several months as WSS came up to speed on the program.

119.   WSS disclosed SmartSky IP, including trade secrets, to DAG.

120.   Many of the ARRH units are manufactured from materials supplied by SmartSky, such as the housings and the cavity duplexers, both of which are custom products made for SmartSky, and not commercially available otherwise.

---

[2] SmartSky's numerous issued patents cover various key concepts and functionality of the ATG communications system and related products developed by SSN, including various key concepts and functionality of the Products developed and produced by WSS under the Agreements. SmartSky does not assert claims for patent infringement here, but reserves the right to do so as the facts of this matter develop.

121.    WSS and DAG are building the Products to the detailed specifications and system requirements set forth in Purchase Orders and SOWs.



123.    By accepting Purchase Orders containing specifications and requirements (evidenced by invoicing services and accepting payments), WSS accepted the specifications and requirements for the Products. WSS used DAG to attempt to develop and build the Products to these specifications and requirements.

124.    WSS claims (but failed to show, despite repeated requests) that it has built the Products to the required specifications and requirements.

**VII.    WSS Accepts Tens of Millions of Dollars from SmartSky But Failed and Refused to Perform Under the Agreements.**

126.    WSS's breaches of the Agreements include the following:

38



129.    WSS breached its obligations under PO2129 by failing to produce and deliver more than half of the contracted number of ARRH units. WSS claims to have built

39

several hundred more ARRH units, but has withheld shipment while demanding that SmartSky execute a new license agreement, even though the terms and conditions governing PO2129 (April T&C) already contain all applicable license terms.



133.    WSS systematically denied SmartSky's right to inspect the Products it has paid WSS tens of millions of dollars to develop and produce.

40

134.    WSS breached its obligations under PO4424 by failing to deliver any SmartCarts despite receiving a $500,000 prepayment from SmartSky. Again, WSS demanded a last-minute license agreement even though the controlling April T&C contained all relevant license terms.

135.    WSS breached its obligations under PO2550 by failing to deliver any Test UEs despite receiving a $166,667 prepayment from SmartSky.

136.    WSS attempted to justify its failure to perform by raising a purported concern that SmartSky would not pay, but this excuse is pretextual and contrived. SmartSky has timely paid all amounts properly invoiced by WSS, amounting to more than $30 million over the course of the business relationship. SmartSky has also provided commercially reasonable assurances of its continued ability to pay.

## VIII. WSS Claims Ownership of the Products and SmartSky Equipment and Threatens to Sell the Products to Third Parties and Steal SmartSky's IP in Violation of the ████████████





142.    On at least one occasion, Laslo Gross told SmartSky personnel via telephone that he planned to sell the Products to SmartSky's biggest competitor, Gogo, LLC ("Gogo").



42



146.    WSS's burgeoning marketing campaign is demonstrated by its revamped website, which includes "Aviation" as a "Market," stating that WSS offers "ground to air, air to ground, & air to air communications solutions." https://www.wireless2.com/aviation (last visited Sept. 8, 2020). One such "Aviation" offering is "Radio Heads," which upon information and belief are the ARRH units SmartSky paid WSS to develop. https://www.wireless2.com/radio-heads (last visited Aug. 11, 2020). The same appears true with the WSS's offerings in "Modems and User Equipment" (https://www.wireless2.com/virtual-epc5g-core), and "Test and Measurement Equipment" (https://www.wireless2.com/test-and-measurement-equipment) (last visited Sept. 8, 2020).

147.    DAG has followed suit, copying WSS's "Aviation" section verbatim on its own website. (https://www.dagwireless.com/markets (last visited Sept. 8, 2020).)



**IX.** **WSS Uses its Alter Ego DAG to Produce and Sell the Products and to Market and Sell the Products in SSN's Field of Use.**

44

152.    Laslo, Susan, and David Gross control and direct the business and operations of WSS, DAG Israel, and DAG USA.

153.    The majority of WSS's development project for SmartSky has been completed by DAG employees holding themselves out as WSS employees. Under this arrangement, and with WSS's David Gross serving as titular head of the company (under the control and direction of Laslo and Susan Gross), DAG's personnel had complete and unfettered access to SmartSky IP.

154.    Unaware of any distinction between WSS and DAG, or at least unaware that DAG was more than a subcontractor, SmartSky was surprised in June 2020 when a crucial draft application to the FCC for certification of the ARRH contained references to DAG.

155.    The significance of this development hit home on August 11, 2020, when multiple news outlets reported that DAG had launched an ATG product: "VelocityXG system," which it described as "wireless broadband technology designed to improve all forms of in-flight connectivity." *See, e.g.*, https://www.computerweekly.com/news/252487478/DAG-Wireless-unveils-4G-5G-infrastructure-for-in-flight-connectivity (last visited Sept. 8, 2020) (attached hereto as "Exhibit 12"). The VelocityXG system allegedly "combines three existing DAG Wireless products – the advanced remote radio-head, base station and mobile-end user device" to "comprise a network system that offers high-quality broadband, end-to-end/ground-to-air, air-to-ground and air-to-air communications capability." *Id.*

45

156. The news reports introduce David Gross as DAG Israel's VP of Operations, and quote him saying: "The VelocityXG system combines three existing DAG Wireless products – the advanced remote radio-head, base station and mobile-end user device. Together, these comprise a network system that offers high-quality broadband, end-to-end/ground-to-air, air-to-ground and air-to-air communications capability." https://www.computerweekly.com/news/252487478/DAG-Wireless-unveils-4G-5G-infrastructure-for-in-flight-connectivity (last visited Aug. 15, 2020).



158. Laslo, Susan, and David Gross conspired to create DAG for the purpose of stealing business opportunities from SmartSky through misappropriation and infringement of SmartSky's IP and misappropriation of the Product developed using that IP.

46

159.     WSS and the Grosses shared SmartSky IP, including trade secrets, with DAG for the express purpose of building a competing product rather than building the Product for SmartSky.

160.     WSS used SmartSky IP and SmartSky money to allegedly develop for itself (and DAG) what WSS has apparently been unable or unwilling to develop working directly for SmartSky with the aid of the SmartSky IP, Materials, and Equipment.

161.     With no prior experience in ATG, and just over two years removed from the launch of its business, DAG could not have independently developed a competing ATG network or product without relying on SmartSky IP or Developed IP.

162.     DAG is WSS's alter ego, as the entities are controlled and completely dominated by WSS and Laslo, Susan and David Gross. WSS and the Gross family exercised this control to commit a dishonest or unjust act that violates SmartSky's rights, has caused SmartSky substantial injury, and will continue to cause SmartSky substantial injury unless and until enjoined.

**X.     SmartSky Terminates the Agreements and Demands that WSS and DAG Cease and Desist from Misappropriating SmartSky IP and Developed IP and from Selling the Product or Derivatives Thereof in the SmartSky Field of Use.**



47



165.    If the Defendants continue their deliberate misconduct of misappropriating SmartSky IP (including trade secrets) and making and selling competing ATG products in the aviation industry which are copied or derived from the SmartSky IP and Developed IP, SmartSky is likely to suffer substantial harm that will be difficult if not impossible to be adequately remedied with money damages.

166.    This harm includes loss of SmartSky's valuable IP rights which it has spent nearly ten years and tens of millions of dollars to develop, and which are a key source of the value of its business.  It also includes loss of sales of ATG systems and products in the aviation field in an amount that will be difficult to estimate, and loss of long-term market share that is very difficult to win back once a competitor, such as WSS or DAG, installs a system on an aircraft. Once a competitor's hardware is installed on an aircraft, it is

48

extremely difficult to get that system removed and replaced due to the substantial investment and permanent aircraft modifications required for a FAA certified equipment installation.

## CAUSES OF ACTION

**COUNT ONE**
**Trade Secret Misappropriation**
**Federal Defend Trade Secrets Act (18 U.S.C. § 1836)**
**All Defendants**

167.    SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count One.

168.    SmartSky is the owner of valuable trade secrets related to ATG network technology and products, which are used in, or intended for use in, interstate or foreign commerce, or which are sold in interstate or foreign commerce.



49



50



170.    SmartSky has taken reasonable measures to keep such information secret, including by (1) requiring vendors and third party contractors like WSS to sign non-disclosure agreements; (2) requiring employees to sign non-disclosure agreements; (3) making non-disclosure of confidential and proprietary information explicit in its employee handbook; (4) restricting employees' physical and electronic access to confidential and

proprietary information and to reports containing such information; (5) requiring a valid user login to access electronic information; and (6) requiring two-factor login.

171. SmartSky's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information. Such value includes a competitive advantage in the market for ATG networks.

172. WSS and the Gross Defendants disclosed, or will inevitably disclose, the SmartSky trade secrets, including through disclosure to DAG, and used or will inevitably use, the SmartSky trade secrets for its own purposes, knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, and that their use was to be limited to development and manufacture of the Products under the Agreements, and at the time of disclosure or use knowing that the SmartSky trade secrets were trade secrets.

173. WSS and the Gross Defendants used improper means to acquire SmartSky's trade secrets because they did so under the false pretense that WSS intended to develop and build the Products for SmartSky.

174.    DAG used or will inevitably use, the SmartSky trade secrets for its own purposes, knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, and that their use was to be limited to development and manufacture of the Products under the Agreements with WSS and the Joint NDA to which DAG Israel was a party, and at the time of disclosure or use knowing that the SmartSky trade secrets were trade secrets.

175.    DAG used improper means to acquire SmartSky's trade secrets because it did so under the false pretense that it intended to assist WSS to develop and build the Products for SmartSky.

176.    Upon information and belief, WSS and DAG have used, and continue to use, SmartSky's trade secrets without consent to develop, manufacture, and assemble components and products for a competing ATG network and products, and in connection with marketing, promoting, and selling their competing ATG network and products, including in the aviation industry.

177.    As a result of the Defendants' respective acts of misappropriation, SmartSky has and will continue to lose sales and customers and the Defendants have been and will continue to be unjustly enriched. SmartSky is thus entitled to an award of damages in an amount to be determined at trial for the actual loss caused by the misappropriation and the resulting unjust enrichment, with such amounts doubled, pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C).

53

178.    SmartSky has been and will continue to be irreparably harmed by Defendants' misappropriation of trade secrets, entitling it to an injunction, including a preliminary injunction, prohibiting Defendants from all further use and disclosure of SmartSky's trade secrets (including without limitation use in connection with making, offering for sale and selling the Products, or derivatives of the Products, to third parties in the aviation field of use) pursuant to 18 U.S.C. § 1836(b)(3)(A).

179.    Defendants' respective acts of misappropriation of SmartSky's trade secrets has been willful and malicious, entitling SmartSky to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT TWO
### Trade Secret Misappropriation
### North Carolina Trade Secrets Protection Act
### (N.C. Gen. Stat. § 24-66-152, *et seq.*)
### All Defendants

180.    SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Two.

181.    SmartSky is the owner of valuable trade secrets related to ATG network technology and products.



54





56

183.     SmartSky has taken reasonable measures to keep such information secret, including by (1) requiring vendors and third party contractors like WSS to sign non-disclosure agreements; (2) requiring employees to sign non-disclosure agreements; (3) making non-disclosure of confidential and proprietary information explicit in its employee handbook; (4) restricting employees' physical and electronic access to confidential and proprietary information and to reports containing such information; (5) requiring a valid user login to access electronic information; and (6) requiring two-factor login.

184.     SmartSky's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information. Such value includes a competitive advantage in the market for ATG networks.

185.     WSS and the Gross Defendants disclosed, or will inevitably disclose, the SmartSky trade secrets, including through disclosure to DAG, and used or will inevitably use, the SmartSky trade secrets for its own purposes, knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, and that their use was to be limited to development and manufacture of the Products under the Agreements, and at the time of disclosure or use knowing that the SmartSky trade secrets were trade secrets.

57

186. WSS and the Gross Defendants used improper means to acquire SmartSky's trade secrets because they did so under the false pretense that WSS intended to develop and build the Products for SmartSky.

187. DAG used or will inevitably use, the SmartSky trade secrets for its own purposes, knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, and that their use was to be limited to development and manufacture of the Products under the Agreements with WSS and the Joint NDA to which DAG Israel was a party, and at the time of disclosure or use knowing that the SmartSky trade secrets were trade secrets.

188. DAG used improper means to acquire SmartSky's trade secrets because it did so under the false pretense that it intended to assist WSS to develop and build the Products for SmartSky.

189. Upon information and belief, WSS and DAG have used, and continue to use, SmartSky's trade secrets without consent to develop, manufacture, and assemble components for a competing ATG network and products, and in connection with marketing, promoting, and selling their competing ATG network.

190. As a result of this misappropriation, SmartSky has and will continue to lose sales and customers and WSS and DAG has been and will continue to be unjustly enriched, and SmartSky is thus entitled to an award of damages in an amount to be determined at trial for the actual loss caused by the misappropriation and the resulting unjust enrichment.

191. SmartSky has been and will continue to be irreparably harmed by WSS and DAG's

misappropriation of trade secrets, entitling it to an injunction, including a preliminary

injunction, prohibiting WSS and DAG from all further use of SmartSky's trade secrets.

192. WSS and DAG's misappropriation of SmartSky's trade secrets has been

willful and malicious, entitling SmartSky to an award of reasonable attorneys' fees.

## COUNT THREE
## Conspiracy to Misappropriate Trade Secrets
## All Defendants

193. SmartSky re-alleges and incorporates the allegations contained in the

foregoing paragraphs as if fully set forth in Count Three.

194. Defendants agreed amongst themselves to misappropriate SmartSky trade

secrets by forming a WSS alter ego, DAG, and disclosing—and in the case of DAG,

accepting— SmartSky IP (including trade secrets) for the purpose of improperly

developing a competing system and products.

195. Defendants' conspiracy resulted in injury to SmartSky by disclosing its trade

secret information for the improper purpose of beating SmartSky to market with ATG

network components or a complete ATG network.

196. Defendants' conspiracy was carried out pursuant to a common scheme to

enrich themselves and their business interests at the expense of SmartSky.

197. Defendants' conspiracy has resulted and will result in damages to SmartSky

in a substantial amount, to be proved at trial.

59

198.    Defendants' conduct has been intentional and malicious and in bad faith, entitling SmartSky to an award of punitive damages.

<div align="center">

**COUNT FOUR**
**Breach of Contract –** 
**WSS**

</div>

199.    SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Four.





61



62



## COUNT FIVE
### Breach of Contract – Purchase Order 002129 and April T&C
### <u>WSS</u>

211. SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Five.

212. WSS breached the terms of PO2129 (Exhibit 2), which required WSS to produce and deliver 1,548 tested, working, and certified ARRH units and 516 tested and working, BBU units. WSS delivered 708 ARRH units that were not certified by the FCC. WSS has failed to deliver the remaining 840 ARRH units.

213. SmartSky performed under PO2129 at all relevant times, including by making timely payment for the ARRH units. To date, WSS has been paid more than the total $8,255,994.84 ARRH PO despite delivering less than half of the ARRH units. SmartSky has paid for the BBUs in full.

214. PO2129 is governed by the terms and conditions in the the April T&C. The April T&C protects SmartSky's rights in its IP and in the Product Deliverables

63

commissioned and produced under PO2129 and other POs, by providing that WSS: "shall not, either during the performance of this Purchase Order or thereafter, (i) reproduce or manufacture any Deliverables or any part thereof for third parties utilizing any designs, drawings, or other technical data or proprietary information or intellectual property belonging to or supplied by or on behalf of SSN except in the performance of Purchase Orders for SSN, or (ii) disclose any designs, drawings, or other technical data or proprietary information or intellectual property which may be considered to be SSN IP, without first obtaining SSN's consent." (April T&C, § 15(b).)

215.    WSS has sold, or is actively attempting to sell, SmartSky's ARRH and BBU Products or reproductions of those products which were developed and produced using SmartSky IP and SmartSky Materials to third parties in the aviation industry, in breach of the April T&C.

216.    WSS has improperly disclosed and provided DAG with SmartSky IP, SmartSky Materials, and SmartSky Equipment, and with access to the Deliverables under PO2129 and the April T&C, and otherwise conspired with and permitted DAG, such that DAG has developed and produced, and has sold, or is actively attempting to sell, SmartSky's ARRH and BBU Products or reproductions of those products which were developed and produced using SmartSky IP and SmartSky Materials, to third parties in the aviation industry, in breach of the April T&C.

217.    WSS has refused to allow SmartSky to exercise its contractual inspection rights for the ARRH units, in breach of PO2129 and the April T&C.

64

218.    PO2129 and the April T&C also include an implied duty of good faith and fair dealing, which required WSS to act fairly and in good faith in carrying out its obligations under these agreements.

219.    WSS breached its duty of good faith and fair dealing in the performance of the PO2129 and the April T&C, including by disclosing in bad faith and with malicious intent SmartSky IP and Developed IP to DAG to allow DAG to misappropriate and misuse the information, including without limitation to develop a competing product, and by using the SmartSky IP and Developed IP to make and offer to sell its own competing products for sale in the aviation industry.

220.    WSS's breach of PO2129 and the April T&C and associated breach of its duty of good faith and fair dealing has resulted and will result in damages to SmartSky in a substantial amount, to be proved at trial.

221.    SmartSky has been and will continue to be irreparably harmed by WSS's breaches of PO2129 and the April T&C and its associated duty of good faith and fair dealing under PO2129 and the April T&C, and is entitled to an injunction, including a preliminary injunction, prohibiting any of the Defendants from selling the Products, or reproductions or derivatives of the Products, to third parties in the aviation field, and from disclosing or using SmartSky IP to create a competing product.

### COUNT SIX
### Breach of Contract – █████
### <u>WSS</u>

222.    SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Six.

65



66

## COUNT SEVEN
## Breach of Contract – SOW 2
## <u>WSS</u>

228.     SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Seven.

229.     WSS breached the terms of SOW 2 by failing to successfully complete any development task set forth therein.

230.     SmartSky performed at all relevant times, including by paying $1,100,000 toward SOW 2 but WSS failed to deliver on its development promises.

231.     WSS breached its implied duty of good faith and fair dealing in the performance of SOW 2 by failing to deliver any product or service contemplated in SOW 2, while at the same time conspiring with DAG to develop and produce competing Products that they are now marketing and offering for sale for the aviation industry.

232.     WSS and its alter ego, DAG, are liable for WSS's breach of SOW 2 and breach of its duty of good faith and fair dealing (*see* Count Twelve), which has resulted and will result in damages to SmartSky in a substantial amount, to be proved at trial.

## COUNT EIGHT
## Breach of Contract – Purchase Order 002547
## <u>WSS</u>

233.     SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Eight.

67



## COUNT NINE
### Breach of Contract – Purchase Order 004424
### <u>WSS</u>

239.    SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Nine.

240.    WSS breached the terms of PO4424, which required WSS to deliver 100 tested and working SmartCarts.

241.    WSS has delivered zero SmartCarts.

242.    SmartSky performed under PO4424 at all relevant times, including by making timely prepayments totaling $500,000.

68

243.   WSS breached its implied duty of good faith and fair dealing in the performance of PO4424 by failing to deliver working and tested SmartCarts, while at the same time conspiring with DAG to develop and produce competing Products that they are now marketing and offering for sale for the aviation industry.

244.   WSS's breach of PO4424 and breach of its duty of good faith and fair dealing under PO4224 has resulted and will result in damages to SmartSky in a substantial amount, to be proved at trial.

<div align="center">

**COUNT TEN**
**Breach of Contract – Purchase Order 002550**
**WSS**

</div>

245.   SmartSky incorporates the foregoing allegations as if fully re-alleged and restated in Count Ten.

246.   WSS breached the terms of PO2550, which required WSS to deliver fifty tested and working Test UEs. WSS has delivered zero Test UEs.

247.   SmartSky performed under PO2550 at all relevant times, including by making timely prepayments totaling $166,667.00.

248.   WSS breached its duty of good faith and fair dealing in the performance of PO2550 by failing to build working and tested Test UEs, while at the same time conspiring with DAG to develop and produce competing Products that they are now marketing and offering for sale for the aviation industry.

249. WSS's breach of PO2550 and breach of its duty of good faith and fair dealing under PO2550 has resulted and will result in damages to SmartSky in a substantial amount, to be proved trial.

## COUNT ELEVEN
### Breach of Contract – Joint NDA
### WSS and DAG

250. SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Eleven.

251. SmartSky, WSS and DAG Israel entered into the Joint NDA on January 15, 2019.

252. The Joint NDA is a valid and enforceable contract under North Carolina law.

253. WSS and DAG breached the terms of the Joint NDA by using SmartSky IP, Developed IP, and confidential and proprietary information for an unauthorized purpose, including creating products (including but not limited to ARRHs and ABRs) to compete with SmartSky rather than building SmartSky products as they agreed to do.

254. SmartSky has performed under the Joint NDA at all relevant times.

255. WSS and DAG breached its implied duty of good faith and fair dealing in the performance of the Joint NDA by in bad faith using SmartSky IP, Developed IP, and confidential and proprietary information for an unauthorized purpose by creating products to compete with SmartSky rather than building SmartSky products as they agreed to do.

256. WSS and DAG's breaches of the Joint NDA and breaches of their duties of good faith and fair dealing under the Joint NDA have resulted and will result in damages to SmartSky in a substantial amount, involving millions of dollars, to be proved at trial.

70

257.    SmartSky has been and will continue to be irreparably harmed by WSS and DAG's breaches of the Joint NDA and their duties of good faith and fair dealing under the Joint NDA and is entitled to an injunction, including a preliminary injunction, prohibiting any of the Defendants from selling the Product, or derivatives of the Product, to third parties in the aviation field, and from disclosing or using SmartSky IP or other confidential or proprietary information to create a competing product under the agreements between SmartSky and WSS.

<div align="center">

**COUNT TWELVE**
**Breach of Contract - Alter Ego and Estoppel Liability**
**DAG**

</div>

258.    SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Twelve.

259.    DAG is controlled and completely dominated by WSS and Laslo, Susan, and David Gross, and performed WSS obligations under the Agreements through DAG employees who purported to also be WSS employees. WSS and the Gross family exercised this control over DAG to commit dishonest and unjust acts that violate SmartSky's rights, has caused SmartSky substantial injury, and will continue to cause SmartSky substantial injury unless and until enjoined.

260.    Through DAG, WSS and the Gross family allegedly created and are now actively marketing for sale the very products they contracted to and were paid to build for SmartSky. Upon information and belief, WSS and the Gross family created DAG for this very purpose.

<div align="center">

71

</div>



263. As WSS's alter ego, DAG owed an implied duty of good faith and fair dealing in the performance of the Breached Contracts. DAG breached this duty of good faith and fair dealing, including by developing and producing competing Products that it is now actively marketing and offering for sale for the aviation industry.

264. DAG's breaches of the Breached Contracts and duties of good faith and fair dealing under the Breached Contracts have resulted and will result in many millions of dollars of damages to SmartSky, to be proved at trial.

## COUNT THIRTEEN
### Unfair and Deceptive Trade Practices – N.C. Gen. Stat. § 75.1.1 *et seq.*
### All Defendants

266.    SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Thirteen.

267.    Defendants' conduct, as alleged herein, constitutes unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 *et seq* (the "Act").

268.    Defendants' unfair and deceptive conduct affected commerce in North Carolina by, among other things, causing injury to SmartSky, a company doing business in North Carolina.

269.    Defendants' wrongful, malicious, unfair, and deceptive conduct—including without limitation forming an alter ego to steal trade secrets and other confidential information with the intent of developing a product to compete with SmartSky— directly and proximately caused injury to SmartSky in excess of $75,000.00.

270.    SmartSky is entitled to recover treble damages from Defendants for their violation of the Act, in addition to reasonable attorneys' fees in an amount to be proven at trial.

<div align="center">

**COUNT FOURTEEN**
**Conversion**
<u>**WSS**</u>

</div>

271.    SmartSky re-alleges and incorporates the allegations contained in the foregoing paragraphs as if fully set forth in Count Fourteen.

272.    WSS sold SmartSky, and SmartSky retrieved from WSS, 119 ARRH units. SmartSky owns the 119 ARRH units.



274.    WSS is in wrongful possession of the 119 ARRH units.

275.    SmartSky demanded return of the 119 ARRH units, but WSS refused to return them.

<div align="center">

<u>**PRAYER FOR RELIEF**</u>

</div>

WHEREFORE, SmartSky respectfully requests that an award be made and entered in its favor and against WSS, DAG, and the Gross Defendants, as follows:

a.    Enter an award in favor of SmartSky and against WSS and DAG on all counts as alleged in this Complaint;

Case 1:20-cv-00834-TDS-LPA   Document 1   Filed 09/10/20   Page 74 of 76



      d.      Requiring the Defendants to return all Products in their possession paid for by or otherwise belonging to SmartSky, including without limitation the 119 ARRH units;

      e.      Award compensatory, actual, treble, and punitive damages against the Defendants in an amount to be determined at trial, involving many millions of dollars;

      f.      Award pre-judgment interest;

      g.      Award costs pursuant to 28 U.S.C. § 2201.

h.      Award SmartSky's reasonable attorney's fees and costs; and

i.      Grant SmartSky such other and further relief as this Court may deem just

and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), SmartSky demands a trial by jury on all questions

of fact the Complaint raises.

This 10th day of September, 2020.

<div style="margin-left: 40%;">

**NELSON MULLINS**
**RILEY & SCARBOROUGH LLP**

*/s/ Fred M. Wood, Jr.*
Fred M. Wood, Jr. (N.C. State Bar No. 18437)
Ariel H. Roberson (N.C. State Bar No. 46085)
301 S. College Street, 23rd Floor
Charlotte, North Carolina 28202
(704) 417-3000 (Phone)
(704) 417-3212 (Fax)
fred.wood@nelsonmullins.com
ariel.roberson@nelsonmullins.com

*Attorneys for Plaintiff*

S. Wade Malone (GA Bar No. 468015)
Mark S. VanderBroek (Ga Bar No. 724440)
Peter L. Munk (GA Bar No. 451809)
201 17th Street, N.W., Suite 1700
Atlanta, GA 30363
(404) 322-6000 (Phone)
(404) 322-6050 (Fax)
wade.malone@nelsonmullins.com
mark.vanderbroek@nelsonmullins.com
peter.munk@nelsonmullins.com

*Attorneys for Plaintiff*
*Pro hac vice applications pending*

</div>

76